(C. D. 1073)

GOLDBERG & SELTZER, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided December 5, 1947)

*Jordan & Klingaman* (*Jacob L. Klingaman* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Richard H. Welsh* and *Arthur R. Martoccia*, special attorneys), for the defendant.

Before TILSON, KINCHELOE, and LAWRENCE, Judges

TILSON, Judge: The question involved in these two suits is the proper classification of certain handbags. They were classified by the collector as articles in chief value of sisal yarn, threads, or filaments in part of sisal braid and duty was levied thereon at the rate of 90 per centum ad valorem under paragraph 1529 (a) of the Tariff Act of 1930. Plaintiff claims the merchandise to be properly dutiable at only 40 per centum ad valorem under paragraph 1023 of the same act, as manufactures, wholly or in chief value of vegetable fiber, except cotton, not specially provided for.

The record consists of the testimony of one witness, exhibits 1 and 2 which represent the involved merchandise, and illustrative exhibits A to I, inclusive. The merchandise was imported from Haiti and entered at the port of New York.

The witness who testified was then engaged in the business of importing sisal goods and mahogany from Haiti, but for 7½ years prior he "* * * was a manufacturer of sisal and mahogany goods in Haiti." He testified that for 7½ years while in Haiti he had manufactured merchandise similar to exhibits 1 and 2 herein; that he had witnessed the production of the material from which the bags are made many times. As to the plant from which the material is obtained and the method of production, the witness testified substantially as follows:

The material is obtained from the leaves of the sisal plant; that these leaves are from 24 to 48 inches in length and from 12 to. 18 inches in width; that one method of separating the involved material from the starchy green of the leaves is to soak the leaves in water for 14 days until they become soft and then beat them with a stick until the starchy green separates from the fibers; the other method is what the natives call combed sisal, in which the leaves are not soaked in water, but are simply put in a tree and by the use of a large wooden comb the fibers are separated from the other portion of the leaves. The fibers as thus obtained are then put in bales and tied. They are not stretched out full length or laid parallel; "They are all different sizes, because we just pick out from the bale about 20 pounds. We don't look how it is and just put it in a bath, and we color it or dye it, and then we put it in the sun to be dried." After the fibers are dry they take three bunches and braid them together. "You simply take the three lots out of that bale of fiber and then start braiding." When the operator reaches the end of one bunch of fibers he just picks up another bunch and holds it in place with his thumb until he braids over it and the protruding ends are cut and made even. There is nothing done to these bunches of fibers to make them stick together or stay in place and they are not twisted in any manner. After these braids have been thus formed "We have forms cut from cardboards.

We lay the braid all around and sew it by hand together on the fold." These bag plates are then sewn together, using 20, 30, or maybe 50 of these same fibers. In sewing these bag plates or forms together, an individual fiber could not be used because it is not strong enough.

On cross-examination the witness admitted quite frankly that in his experience of making sisal handbags he had made sisal woven bags and some with sisal embroidered on the bag, and some braided bags with sisal embroidered on them; that he had bought twisted sisal cord and made bags from that; also that he had made woven table mats of sisal fibers; that he was familiar with woven mats in part of embroidery and in part of fringe, all made of sisal fibers.

On redirect examination he testified that in making these woven articles like illustrative exhibit E "We have a frame where sisal is put across the frame and have near one another bundles of fibers and then other bundles are cross-woven on that frame to the sisal fibers"; you take a number of fibers, the same as you would for braiding, and instead of braiding, you weave with that same bunch of fibers. "This sisal fiber cannot be woven in a larger size than approximately 18 to 20 inches"; that if you wanted a larger size, you would have to join the ends of the fibers and then it would show, and commercially that would be no good. A single fiber could not be used to make embroidery because it is not strong enough. "It would break before even going through the bag." He also stated that from an ocular examination he thought the individual sisal fibers that make up illustrative exhibit F are twisted into making a yarn.

Counsel for the plaintiff conceded that the imported merchandise was made in part of braid, but strenuously contends that such braids are not made of yarns, threads, or filaments. This leaves for our determination the sole question of whether or not such braids are composed of yarns, threads, or filaments. If they are so composed, then the classification was correct, and if they are not so composed, then the plaintiff is entitled to judgment in his favor.

Upon the facts in this case it appears to us that the answer to the question here presented is to be found in the following quotation from the case of *United States* v. *Veit, Son & Co.,* 8 Ct. Cust. Appls. 290:

According to these definitions the associated terms "yarns, threads, or filaments" would ordinarily apply to such materials only as may be used in the generally known processes of knitting, weaving, or sewing. This interpretation is approved in the present case by a comparison of the several provisions of the tariff paragraph in question. That paragraph names many specific articles, all of which are made by knitting, weaving, or sewing, or similar processes, and finally applies to all of them the phrase now under review, to wit, "all of the foregoing of whatever yarns, threads, or filaments composed."

We are therefore convinced that these terms were intended to cover only such materials as are generally known as materials for knitting, weaving, or sewing, and inasmuch as the present lame or lahn, and bullion, are incapable of such use,

the goods of which they compose the chief value do not answer to the qualifications of the paragraph.

It is argued on behalf of the Government that the bullion in these articles is capable of being again permanently straightened, and thus restored to its former status as lame or lahn, and that when thus straightened it might be used as a thread for sewing. We think it clear, however, that the bullion as a component material must be considered in its condition when it enters into the goods under review, and the question is whether it is then a yarn, thread, or filament, and not whether it may become such after its name and nature are changed by further processing. United States *v*. Meadows (2 Ct. Cust. Appls., 143; T. D. 31665); True Fit Waterproof Co. *v*. United States (7 Ct. Cust. Appls., 489; T. D. 37107).

This record shows that the involved fibers have been processed no further towards a yarn, thread, or filament than to have beaten from them their retaining substance as it all appeared in the original leaf of the sisal plant. It is true that before being used to make the braid, the majority, if not all, of the fibers have been dyed, but this dyeing process did not advance these fibers towards the stage of a yarn, thread, or filament. It would be just as logical to hold the dyeing of raw cotton as it comes from the gin to be a process advancing the raw cotton towards the stage of yarns, threads, or filaments as it would be to hold the dyeing of these fibers to be a process advancing them towards the stage of yarns, threads, or filaments. The raw cotton is still raw cotton after it is dyed and these fibers are still raw fibers after they are dyed, both far removed from the stage in their manufacture where they would be generally known as materials for knitting, weaving, or sewing.

It is scarcely to be doubted that the involved fibers are capable of being brought to the point, by the application of the proper manufacturing processes, where they are in fact yarns, threads, or filaments, but paragraph 1529 (a) makes no provision for such material. These fibers as a component material of the instant merchandise must be considered in their condition when they enter into the goods, and the question is are they then yarns, threads, or filaments, and not whether or not they may become such after their name and nature are changed by further processing.

In *United States* v. *Borgfeldt & Co.*, 14 Ct. Cust. Appls. 240, our appellate court, referring to the case of *Rolland Frères* v. *United States*, 11 Ct. Cust. Appls. 321, said:

* * * These articles were held to be not properly classifiable as such [yarns, threads, filaments] even by similitude, for the reason that they could not be used "substantially in the way true yarns, threads, fibers, and filaments may be used in weaving, knitting, embroidering, or in similar processes." [Words in brackets supplied.]

It seems clear to us that a single fiber or structure which is so weak, or lacking in strength, that it cannot be used for sewing and which is so brittle that it breaks when bent, unless thoroughly dampened or wet, and which comes in lengths of from 24 to 48 inches only,

could not be used "substantially in the way true yarns, threads, * * * and filaments may be used in weaving, knitting, embroidering, or in similar processes." In our opinion, if these fibers or structures possessed all the qualities other than length necessary to bring them within the definition of true yarns, threads, and filaments, the fact that they are in lengths of not more than 24 to 48 inches would be amply sufficient to render them unfit for use "substantially in the way true yarns, threads, * * * and filaments may be used in weaving, knitting, embroidering, or similar processes."

It is an undisputed fact that these fibers or structures are never produced in lengths of more than 24 to 48 inches and that absolutely nothing is ever done to them in the way of twisting, etc., to remove them from their original status after having the pulpy substance of the sisal leaf beaten or combed from them. Certainly materials which are "generally known as materials for knitting, weaving, or sewing," are not in lengths of not more than 24 to 48 inches. How, may we ask, would a modern loom utilize fibers or structures never more than from 24 to 48 inches in length? How, may we again ask, would a modern knitting machine utilize fibers or structures never more than from 24 to 48 inches in length, or what person today would knit a sweater, a pair of gloves, or a pair of socks with fibers or structures not more than from 24 to 48 inches in length? In addition to the above limitation on length, it should be remembered that the instant fibers or structures are so lacking in strength that a single fiber or structure cannot be used, but it is necessary to use 20 or 30, or perhaps 50 of these single fibers or structures in sewing. Generally, the sewing needles of today are not so constructed as to be capable of utilizing from 20 to 30 of the instant fibers or structures at one time, and it would therefore be impossible to use these fibers or structures in sewing.

The facts in the instant case clearly distinguish it from the case of *Huber* v. *United States*, 33 C. C. P. A. 46. In the original *Huber* case, 6 Cust. Ct. 140, this court found that:

* * * The fibers, which are relatively long, are then joined at the ends by overlapping two fibers about 4 inches and then rolling on the knee, using a small piece of pottery; the material being moist, the rolling of the two overlapping ends causes the two fibers to merge together into one continuous strand; * * *.

The following is quoted from the testimony in *Huber* v. *United States*, 33 C. C. P. A. 46:

A. * * * They make the fibers soft and then they twist them together and roll them up. They roll with their thigh.

Q. Roll them by hand?—A. Yes.

Q. What does that do to them?—A. Well, they roll them up, and then they put the fibers on a Chinese loom, they work with their hand to make the cloth.

Q. Let us get this straight: What do they do with the pieces which are twisted?—A. They roll them up in a little ball, and put them on the loom to make the cloth.

Q. How do they make the article out of these exhibits?—A. They make the cloth first and then out of the cloth they make whatever they want, like a dress for clothes, anything they want they cut out.

\* \* \* \* \* \* \*

X Q. How long are these fibers before you roll them together?—A. The length is maybe 5 feet or 4 feet or 3 feet. Sometimes it is a little longer, and sometimes shorter.

X Q. They roll them together?—A. First they twist these under, and then they roll them to make them tight.

X Q. They put them up in the form of balls, and that is when they are ready for weaving, is that right?—A. Yes.

Upon the above facts, our appellate court held the fibers or structures in the *Huber* case, *supra*, to be yarns, threads, or filaments within the meaning of paragraph 1529 (a). In the instant case, the fibers or structures are not twisted together and then rolled into a ball and put on a loom to make cloth.

Based upon the facts in this case, for the reasons stated, and following the cited authorities, we hold that the fibers or structures involved herein have not reached the status of materials which are generally known as materials for knitting, weaving, or sewing, and therefore they do not answer the requirements of said paragraph 1529 (a). We therefore hold the merchandise covered by these two suits to be properly dutiable at only 40 per centum ad valorem under paragraph 1023, as alleged by the plaintiff.

To the extent indicated the specified claim in these two suits is sustained; in all other respects and as to all other merchandise all the claims are overruled. Judgment will be rendered accordingly.